IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PRESTON WAYNE BOGART,

      Plaintiff,

v.                                                                                     CV 14-61 WPL

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Preston Bogart applied for Supplemental Security Income on March 17, 2010, based on carpal tunnel syndrome and other disorders of bone and cartilage. (Administrative Record ("AR") 42, 144.) After his applications were denied at all administrative levels, he brought this proceeding for judicial review. The case is before me now on Bogart's Motion to Reverse or Remand for Rehearing, a response filed by the Commissioner of the Social Security Administration ("SSA"), and Bogart's reply. (Docs. 17, 21-22.) For the reasons explained below, I grant Bogart's motion and remand this case to the SSA for proceedings consistent with this opinion.

**STANDARD OF REVIEW**

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall*

*v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse or remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 416.920(e). At the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. § 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot*

*v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to his past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Bogart is a fifty-four-year-old man with a high-school education. (AR 149.) He worked as a tire-man at a tire company from 1990-1998 and at the beginning of 2005. (AR 150.) Bogart was a truck driver between 1999 and 2001, and worked as a cashier at an Allsups and as an assembly line worker at a factory, for one month each in 2003. (*Id.*) He has a specialized certificate in front end alignment and brakes, as well as a truck-driving certification. (AR 149.) Bogart alleges disability beginning on October 23, 2009. (AR 184.)[1] Because Bogart argues that the ALJ erred in her evaluation and application of certain medical opinions, I focus my discussion on those opinions and records.

On January 6, 2010, Bogart went to Valencia Family Medicine ("VFM") for pain following a left inguinal hernia repair. (AR 243-45.) Leona Herrell, CFNP, treated Bogart and noted a surgical history of a right elbow surgery, four hernia repairs, and a laparotomy secondary to a gunshot wound. (AR 244.) Bogart reported cocaine and crack cocaine use that stopped around 2003, and a history of smoking two packs of cigarettes per day and drinking

---

[1] Bogart alleged disability beginning February 1, 2005. (AR 113, 143.) His claims were previously denied on October 22, 2009. (AR 184.) Additionally, he applied for Disability Insurance Benefits, but does not qualify because his date last insured was March 31, 2007. (AR 41, 46.) Bogart's alleged onset date was adjusted by the SSA pursuant to res judicata because of the 2009 denial of benefits. Only Bogart's application for Supplement Security Income with an adjusted alleged onset date of October 23, 2009, was considered by the ALJ. (AR 12.)

approximately a case of beer each week for the past thirty-five years. (*Id.*) His breathing was regular, even, and non-labored. (*Id.*)

Bogart returned to VFM on March 1, 2010, for a follow-up visit. (AR 249.) Herrell noted that Bogart again had regular, even, non-labored breathing, but that he exhibited a prolonged expiratory phase. (*Id.*)

On March 29, 2010, during a follow-up visit at VFM, Herrell noted that Bogart had diminished breath sounds at the bases of both lungs and prolonged expirations. (AR 251.)

Bogart visited an SSA Field Office on April 14, 2010. (AR 143, 147.) L. Sanchez, an SSA employee, filled out a Disability Report on Bogart and noted that he exhibited difficulty talking and sitting; that he was neatly dressed, but that his clothes looked dirty; that he mumbled throughout the interview; and that he stood up and stretched throughout the interview. (AR 145-46.) Bogart also filled out a Disability Report, in which he reported neuropathy in both arms and hands, high blood pressure, osteoarthritis, anxiety, degenerative joint disease in the left shoulder, and emphysema resulting in his lungs functioning at 40 percent. (AR 148.) Bogart wrote that he stopped working on February 1, 2005, because of his conditions. (*Id.*) He had never seen a doctor or health care professional for his mental conditions. (AR 152.) At that time, Bogart was taking atenolol (high blood pressure), lisinopril (high blood pressure), meloxicam (pain), omeprazole (acid reflux), Percocet (pain), phoventic (emphysema), Symbicort (emphysema), and vistaril (anxiety). (*Id.*)

On April 15, 2010, Ronald Bronitsky, M.D., a pulmonologist with the Presbyterian Medical Group, filled out a progress note indicating that he first treated Bogart on March 16, 2010, for shortness of breath. (AR 281.) Dr. Bronitsky indicated that Bogart's pulmonary screenings were difficult to interpret because "[h]e did not have a good effort." (*Id.*) Dr.

4

Bronitsky read the CT scan from March 18, 2010, and found that it showed some emphysematous changes in the upper lobes, but no other significant findings. (*Id.*) Dr. Bronitsky observed that Bogart looked much older than his stated age and smelled heavily of cigarettes. (*Id.*) Bogart reported drinking heavily. (*Id.*) Dr. Bronitsky advised him to quit smoking; Bogart reported that he was down to half a pack a day and would need to quit smoking and drinking at the same time in order to be successful. (*Id.*) Complete pulmonary function tests revealed moderate combined obstructive restrictive defect with significant air trapping and a mild decrease in diffusion capacity, consistent with emphysematous changes. (*Id.*) Bogart's lungs were resonant, with mild expiratory slowing, slightly diminished breath sounds, and no audible rales. (*Id.*)

      Bogart filled out a Function Report on April 24, 2010, indicating that his daily activities included only watching TV. (AR 175.) Bogart reported that he feeds and waters his dog, but was no longer able to walk the dog. (AR 176.) Bogart reported no problems with his personal care or ability to prepare his own meals. (AR 176-77.) He does laundry, but is unable to do yard work because of shoulder pain and breathing difficulties. (AR 178.) Bogart can go out by himself and does his own grocery shopping, but does not own a car. (*Id.*) His hobbies included TV, camping, and fishing. (AR 179.) Bogart reported that he watches TV every day, but can no longer hold a fishing pole or walk long distances. (*Id.*) Bogart is right-handed and uses glasses/contacts but no other assistive devices. (AR 180-81.) He indicated that his conditions affect his ability to lift, walk, climb stairs, and use his hands: he can walk about fifty yards, but then he cannot breathe, and his hands go numb. (AR 180.)

      Bogart returned to VFM and Herrell for a follow-up on April 29, 2010. (AR 275.) His breathing was regular, even, and non-labored, with a few scattered rhonchi and diminished

breath sounds at the bases. (AR 275-76.) Herrell diagnosed Bogart with chronic obstructive asthma unspecified, osteoarthrosis localized primarily in the left shoulder, and chronic pain. (AR 276.)

At another follow-up visit on May 24, 2010, Bogart complained of right-hand numbness and tingling with associated weakness, left-hand numbness, and burning pain described as originating at the elbow and radiating into the hand. (AR 277.) Herrell again noted diminished breath sounds at the bases and prolonged expirations. (AR 278.) Herrell diagnosed Bogart with benign essential hypertension, anxiety state unspecified, reflux esophagitis, and disturbance of skin sensation. (*Id.*)

State agency non-examining medical consultant Mary Lanette Rees, M.D., conducted a Physical RFC Assessment for Bogart on September 10, 2010. (AR 285-92.) Dr. Rees specified that her assessment was for October 23, 2009, and later. (AR 285.) Dr. Rees found a primary diagnosis of degenerative joint disease in the left shoulder, a secondary diagnosis of left carpal tunnel, and other alleged impairments including hypertension and emphysema. (*Id.*) Based on the medical record, Dr. Rees determined that Bogart was limited to occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and pushing and pulling without limitation. (AR 286.) In support of these limitations, Dr. Rees noted that Bogart's hypertension is controlled by medication without target organ damage; he has a remote history of right ulnar transposition with normal exams; remote history of untreated left shoulder separation with moderate degenerative joint disease, painful range of motion, and limited overhead range of motion; and a CT scan with minimal emphysema. (AR 286-87.) Dr. Rees also determined that Bogart could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds;

engage in limited reach in all directions, including overhead limitations with his left arm; and perform limited handling with his left hand. (AR 287-88.) Dr. Rees found Bogart partially credible. (AR 290.)

Bogart filled out another Disability Report on October 14, 2010. (AR 188-93.) He stated that his condition had worsened. (AR 188.) He experienced increased difficulty breathing, constant shortness of breath, needing to rest, feeling fatigued, and he used a C-PAP every night. (*Id.*) He had increased neuropathy, such that his hands were always numb and tingly, he was unable to feel, and he used a hand brace on his right hand. (*Id.*) Bogart reported that he had become unable to lift his arms above his chest due to osteoarthritis and degenerative joint disease. (*Id.*) Bogart listed his new limitations as an inability to walk or stand for too long, difficulty breathing, disorientation and dizziness, lack of focus and concentration, irritability, frustration, mood changes, and lack of sleep. (*Id.*) In terms of his personal care, Bogart reported that he has difficulty showering and is unable to clean his hair or shave because he cannot lift his arms above his chest, he does not brush his teeth because his hands are numb and he always drops things, he needs rest while getting dressed, and he is unable to feed himself because his hands are numb. (AR 191.) Bogart was taking atenolol, lisinopril, meloxicam, omeprazole, oxycodone, Proventil, Symbicort, and vistral. (AR 190.)

Bogart completed another Disability Report on March 4, 2011. (AR 196-202.) He reported worsening conditions, including continuous neuropathy in his hands, an unsuccessful carpal tunnel surgery resulting in pain and weakness in his right hand, panic attacks, and the use of a C-PAP for sleep apnea. (AR 196.) Bogart indicated that his new limitations included being unable to lift or carry things because he drops them; shortness of breath; inability to walk for

7

long periods; inability to bend, sit, or tie shoes; stress; anger; frustration; memory problems; focus and concentration problems; an inability to read, and poor vision. (*Id.*)

Bogart returned to Dr. Bronitsky on April 6, 2011. (AR 314.) He was last seen in October 2010 for chronic obstructive pulmonary disease, when his pulmonary function was around 60 percent of that predicted. (*Id.*) Bogart continued to smoke approximately a pack and a half of cigarettes each day and continued to drink heavily. (*Id.*) Dr. Bronitsky noted that Bogart smelled of alcohol, but said he had not imbibed since the previous night. (*Id.*) Bogart reported dizziness and shortness of breath, but Dr. Bronitsky heard nothing abnormal in his lungs and did not think that there was a hypoxic cause for Bogart's symptoms at that time. (*Id.*)

VFM records indicate that Bogart was seen by Herrell for follow-up visits on July 25, October 19, October 27, November 17, and December 1, 2011. (AR 350-59.) At these visits, Bogart sought medication refills, complained of various aches and pains, and was referred for a colonoscopy. (*Id.*) Herrell noted that Bogart has a long history of insomnia. (AR 351.)

Bogart received ultrasound and electrical stimulation treatments for chronic pain in his lower back and shoulders at VFM on February 5, 16, and 23, 2012. (AR 343-49.) He exhibited tenderness to his right shoulder and lumbar back with range of motion. (AR 345, 348.)

Bogart returned to VFM on March 8, 2012, complaining of lower back pain, shoulder pain, and insomnia. (AR 341-42.) Herrell noted that Bogart has a history of chronic back pain, exacerbated by standing for long periods, and a history of insomnia. (AR 341.) He exhibited a normal gait, limited range of motion in his upper extremities, and increased pain with movement. (AR 342.) Herrell diagnosed Bogart with lumbago, chronic pain, shoulder pain, and insomnia unspecified. (*Id.*) Herrell wrote a letter for Bogart, indicating that Bogart was her patient and that

he suffered from chronic pain related to osteoarthritis, rendering him unable to perform most physical activities due to pain. (AR 340.)

### HEARING TESTIMONY

The ALJ held a hearing on May 8, 2012, at which Bogart and a Vocational Expert ("VE") testified. (AR 27-40.) Bogart was represented by an attorney. (*Id.*)

Bogart testified that he graduated from high school and last worked in 2007. (AR 29.) He has not worked for more than two months since 2005, when he worked at a tire company. (*Id.*) While working for the tire company, Bogart removed, replaced, and repaired tires for semi-trucks and off-road equipment. (*Id.*) He drove trucks cross-country until 2005. (AR 29-30.)

Bogart testified that he had not quit smoking, but was working on it and was down to about a pack every three days. (AR 30.) Doctors advised Bogart to quit smoking, but did not provide medical assistance, and Bogart did not request such assistance. (AR 30-31.) Bogart told the ALJ that he continued drinking, but was down to about one beer per day. (AR 31.)

Bogart said that doctors are treating his emphysema with inhalers, but that it does not work well, and he had not seen Dr. Bronitsky for about six months. (*Id.*) Bogart testified that he had been seeing Herrell for about three years, and she had advised him to quit smoking and to contact her office when he was ready if he wanted help. (AR 31-32.) Bogart confirmed that he had surgery for carpal tunnel syndrome on his right hand, but still experiences some numbness and tingling, still drops things, and still has some neuropathy in both hands. (AR 32.) His symptoms are worse in his right hand, and he is right-handed. (AR 33.) Additionally, Bogart testified that he has degenerative joint disease in his left shoulder and osteoarthritis in his right shoulder. (*Id.*) Bogart said that doctors noticed that he suffered from anxiety, and that he has

been taking medication to control it, but still suffers from little panic attacks occasionally. (AR 33-34.)

Bogart testified that, since 2005, he has been supporting himself through state general assistance and food stamps and by staying with a friend of his. (AR 33.) Bogart said that he takes his dogs out during the day and does dishes at the house. (*Id.*) He enjoys hunting and fishing, but does not get to do those things anymore. (*Id.*)

Bogart's attorney then questioned him. Bogart testified that he has a difficult time pouring coffee from a pot weighing 4-5 pounds and must use both hands for the task. (AR 34.) He said that he can feel warmth and pressure with both hands, and that the numbness comes and goes. (*Id.*) Bogart stated that he wears carpal tunnel braces on both hands every night. (AR 35.) He sometimes has difficulty walking due to scoliosis, and his right leg occasionally gives out when he walks. (*Id.*) Bogart said that he can walk about fifty yards before he becomes short of breath. (*Id.*) He can stand for approximately ten minutes and can sit down, but he has to move around to remain comfortable. (AR 36.) Bogart testified that the temperature in the shower makes it hard for him to breathe. (AR 37.) Bogart takes medication for insomnia that helps him get a good night's sleep most nights. (*Id.*) He gets nauseous in the sun because of his blood pressure medication. (AR 37-38.)

The ALJ next questioned the VE. (AR 38-39.) The ALJ asked the VE for a description of Bogart's past work. (AR 38.) The VE testified that Bogart's past work included work as a tire repairer, heavy, semi-skilled, with a special vocational preparation ("SVP") of 3, and a tractor trailer truck driver, medium, semi-skilled, with an SVP of 4. (*Id.*) The ALJ then confirmed with the VE that someone of Bogart's age, who is able to do light work, could not perform Bogart's past work. (*Id.*) The ALJ then asked the VE if someone of Bogart's age, limited to light work

with the additional limitations of occasionally lifting 20 pounds; frequently lifting 10 pounds; standing or sitting for about six hours in an eight-hour workday; occasionally balancing; occasionally reaching overhead with his left arm; frequently handling with his left hand; experiencing no limitations with his right arm or hand; and avoiding concentrated exposure to fumes, odors, dust, gases, and poor ventilation; could work. (AR 38-39.) The VE testified that such a person could work as a cashier II, light, unskilled; a mail clerk, light, unskilled; or an office helper, light, unskilled. (AR 39.)

Bogart's attorney declined to question the VE because he disagreed with the ALJ's RFC finding of light work. (*Id.*) Bogart's attorney stated that he believed Bogart was limited to sedentary work because of the carpal tunnel syndrome, osteoarthritis, and emphysema. (AR 40.)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Bogart's application according to the five-step sequential evaluation process. (AR 12-19.) At the first step, the ALJ found that Bogart had not engaged in substantial gainful activity since March 17, 2010, the application date. (AR 14.) Then, at the second step, the ALJ concluded that Bogart suffers from the severe impairments of emphysema and carpal tunnel syndrome. (*Id.*) At step three, the ALJ found that Bogart's combination of severe impairments did not equal one of the listed impairments. (*Id.*)

The ALJ then determined Bogart's RFC, finding that Bogart can perform light work, except that he can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand or walk for about six hours in an eight-hour workday; sit for about six hour in an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; engage in limited reaching in all directions with only occasional reaching overhead with his left arm; has no limitations with his right arm; frequently handle with his left hand, with

no limitation on his right; and must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (AR 14-15.)

The ALJ summarized Bogart's testimony and the AR. (AR 15-17.) She noted that Bogart's 2009 x-rays showed moderate degenerative joint disease in his left shoulder. (AR 15.) The ALJ further summarized Bogart's pulmonary history and noted that Bogart continued smoking, despite suffering from emphysema and receiving repeated medical advice to stop. (AR 15-16.) The ALJ concluded that Bogart's anxiety was controlled with medication, but that his inhalers did not help much with the emphysema. (AR 16.) Bogart further testified that he can tend to his own personal care, do laundry, and feed himself. (*Id.*) The ALJ concluded that Bogart's continued smoking and drinking, despite medical advice to the contrary, suggested a lifestyle choice more than a medical impairment. (AR 17.) The ALJ noted that the only treating source offering an opinion in the record was Herrell, but that her letter was not accorded much weight because it was brief and conclusory. (*Id.*)

At step four, the ALJ concluded that Bogart is unable to perform his past relevant work. (*Id.*) At step five, however, the ALJ found that, considering Bogart's age, education, work experience, and RFC, Bogart can perform the work of a cashier II, mail clerk, or office helper. (AR 17-18.) As the ALJ determined that Bogart could perform jobs existing in substantial numbers in the national and regional economies, the ALJ concluded that Bogart was not disabled. (AR 18.)

Bogart appealed the decision to the Appeals Council, but the Council found that Bogart's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-5.)

**DISCUSSION**

Bogart makes several arguments for reversing and remanding this case. I have reordered the arguments to accord with the five-step sequential evaluation process. Bogart first argues that the ALJ's opinion is internally inconsistent at step two and the RFC stage, precluding meaningful review, because the ALJ found severe impairments at step two but no significant limitations at the RFC stage. Bogart makes three contentions at the RFC stage: First, he challenges the ALJ's treatment of Dr. Rees's Physical RFC Assessment. Second, Bogart argues that the ALJ failed to accord appropriate weight to Herrell's opinion because she did not adequately consider the treating relationship between Herrell and Bogart pursuant to Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (Aug. 9, 2006).[2] Third, Bogart argues that the ALJ's description of the reaching requirement in her written decision was insufficient to accord with the narrative discussion requirements of SSR 96-8p, 1996 WL 374184 (July 2, 1996), or the definition of "light work" contained in SSR 83-10, 1983 WL 31251 (Jan. 1, 1983). Next, Bogart argues that the ALJ erred at step five by failing to sufficiently explain the reaching limitation to the VE, rendering the VE's opinion unsupported by substantial evidence. Finally, Bogart argues generally that the decision is not supported by substantial evidence.

**I.   Step Two and RFC-Stage Findings**

Initially, Bogart argues that the ALJ's determination at step two that he has the severe impairments of emphysema and carpal tunnel syndrome is inconsistent with her finding at the RFC stage that Bogart's impairments do not significantly limit his ability to perform basic work activities and that he is capable of performing light work. This argument is without merit.

---

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

The step-two determination is governed solely by medical factors, without consideration of vocational factors. *Williams*, 844 F.2d at 750-51. To establish a severe impairment at step two, "the claimant [must] present[] medical evidence and make[] the *de minimis* showing of medical severity . . . ." *Id.* at 751. That is, the claimant must show that "his impairments would have more than a minimal effect on his ability to do basic work activities" in order to survive step two. *Id.* "A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Id.* Despite the ALJ's inartful use of similar language, the two determinations are governed by different standards. The ALJ's findings at step two and the RFC stage are not internally inconsistent.

## II.     RFC Findings

In challenging the ALJ's treatment of Dr. Rees's Physical RFC Assessment, Bogart argues that the ALJ should have included Dr. Rees's professional qualifications, pursuant to the Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX"). Specifically, HALLEX I-2-1-30A directs ALJs to include the professional qualifications of any health care professionals whose medical report, analysis, assessment, or judgment is admitted into the record. http://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-30.html (last updated Sept. 28, 2005). Bogart notes that, according to his internet research, Dr. Rees is an anesthesiologist. However, Bogart does not actually allege any prejudice resulting from the ALJ's failure to include Dr. Rees's professional qualifications. (*See* Doc. 17 at 8.)

In *Butterick v. Astrue*, the Tenth Circuit assumed without deciding that it could grant relief for "prejudicial violations of the HALLEX provisions," but refused to grant any relief where the claimant failed "to formulate or articulate [] prejudice . . . ." 430 F. App'x 665, 668

14

(10th Cir. 2011) (unpublished); *see also Shave v. Apfel*, 238 F.3d 592, 596-97 (5th Cir. 2001) (holding that only prejudicial violations of HALLEX provisions may entitle a claimant to relief). Similarly, in *McCoy v. Barnhart*, the court concluded that HALLEX provisions do not have the force of law, and are not binding on the SSA, when those provisions go beyond the regulations and become "an internal procedure manual." 309 F. Supp. 2d 1281, 1284 (D. Kan. 2004).

The ALJ did not provide any detail about Dr. Rees's qualifications, beyond the fact that she is a medical doctor and one of the state agency's consulting physicians. However, pursuant to *Butterick*, this failure was not prejudicial. Accordingly, the ALJ did not commit reversible error by failing to conform with HALLEX provisions.

Bogart goes on to argue that the ALJ erred by not considering the treating relationship between Herrell and Bogart. Nurses are not "acceptable medical sources" under 20 C.F.R. § 416.913 and cannot be considered as treating sources. SSR 06-03p states that other sources, including nurse practitioners like Herrell, "cannot establish the existence of a medically determinable impairment," but "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." 2006 WL 2329939, at *2. ALJs are required to consider evidence from other sources when evaluating an acceptable medical source's opinion. *Id.* at *4; 20 C.F.R. § 416.927. The factors for weighing the opinions of acceptable medical sources, as established in 20 C.F.R. § 416.927(c), apply to all other sources of opinion evidence bearing on the questions of severity and limitation. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *4.

Here, the ALJ stated the weight she gave to Herrell's opinion and noted that Herrell's letter was "conclusory." (AR 17.) While the ALJ did mention that Herrell was the only treating source, of any kind, to opine on Bogart's limitations, the ALJ did not apply the factors laid out in

15

20 C.F.R. § 416.927(c). The ALJ did not discuss Herrell's specialization or other factors, including the treatment relationship or whether Herrell's opinion was consistent with the record as a whole. This was error. On remand, the ALJ will more fully develop the weight assigned to Herrell's opinion and the reasons therefore.

Because I have found legal error in the treatment of other source opinions at the RFC stage of the sequential evaluation process, I do not address whether the ALJ described a sufficiently specific RFC or whether her questions to the VE were adequate. Nor do I address whether the ALJ's decision is supported by substantial evidence.

## CONCLUSION

I find that Bogart's argument as to inconsistencies between step two and the RFC stage is without merit. Further, I find that the ALJ did not commit reversible error by not describing Dr. Rees's qualifications and not complying with the HALLEX provisions. I find that the ALJ erred at the RFC stage by failing to discuss the factors used to determine the weight accorded to a medical provider who is not an acceptable source. On remand, the ALJ will address the factors listed in 20 C.F.R. § 416.927(c) with regard to Herrell. The motion is GRANTED, and the case is remanded to the SSA for further proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.